I thought I would first address the issue of whether or not the murder-for-hire statute constitutes a crime of violence under 924, and then move on to the sufficiency of the evidence of whether or not Mr. Walker had the requisite intent to commit the murder to violate the murder-for-hire statute. The first issue, though, is whether Section 1958A, the murder-for-hire statute, is a crime of violence as that's defined under 18 U.S.C. 924C1. And that creates two possible categories of crimes of violence. The first is if the offense has an element of force or threat or use of force against another or their property. The second is if the underlying offense poses a substantial risk that force would be used. But that is limited by the substantial risk has to be during the course of the commission of the offense. And at least two circuits, the Eighth Circuit in the Delpit case and the Eleventh Circuit in Preacher, have held that the offense under Section 1958A is complete upon travel in interstate commerce or the use of any facility in interstate commerce. And if the offense is complete upon the use of the facility of interstate commerce or the travel in interstate commerce, the object of the offense, the murder, would not be committed during the course of committing the offense because the offense has already been completed before any violence or threat of violence could be used. The government does cite a Fourth Circuit case, United States v. Luskin, and that is a 1991 case that did not apply the categorical approach that's employed now to determine whether a crime satisfies the crime of violence definition. In that case, the court was looking at the underlying conduct, but under the categorical approach that's been adopted since that case was decided in 1991. They filed some cases in their 28J letter to us, Drury out of the Eleventh Circuit, and we'll cite several, but Drury out of the Eleventh Circuit and Winn, I guess it is, v. Attorney General out of the Third Circuit. But in short, with respect to the argument you're making, what do you say about the cases the government cited on that point in their 28J? In the Third Circuit case, the defendant did not make the argument that I'm making here. The argument in that case that the defendant made was that there was no agreement because the undercover agent couldn't agree with him to commit the murder. He did not make the argument in that case that the offense was complete upon use of an interstate facility, of interstate commerce, or travel. So the Third Circuit case didn't address that issue, and my memory of Drury was it didn't address that issue either, if I'm correct. I apologize. Isn't the offense for which Walker is charged, the murder for hire, wasn't that a conspiracy? Wasn't he convicted of conspiracy on that count? Yes. And if he's involved in a conspiracy in which the planned conduct is to murder someone, isn't that substantial about whatever the language is, the likelihood of violence, et cetera, et cetera? Well, the fact that the— Frankly, your argument seems mighty weak. Well, even if it's a conspiracy, the offense would be complete upon the use of an interstate facility. That would be my argument. And I'll move on to the first issue then on the sufficiency of the evidence for the intent that a murder would be committed in violation of U.S. or state law. The only evidence that the agents had said that this murder would take place in Laredo was from Agent Leonard, and he claimed that he had told Agent Leonard that the murder would take place in Laredo. But there was no testimony from Kevin Corley that he conveyed this to Walker, and the— This is your argument that there's not sufficient evidence of an intent to commit a murder in the United States. Correct. Is that it? Correct. What's the evidence that where the murder was likely to occur was of any consequence to the defendant in terms of the conspiracy, the plan to do it? Is there any evidence that would suggest that, oh, I'm not going to do this if it's in the United States? No, no. And that isn't my argument, but I understand the question. All right. What's your argument then? The argument is that the object of the conspiracy has to be a murder in violation of U.S. or state law, and absent evidence that the object of the conspiracy was in violation of U.S. or state law, that he didn't—the agreement wasn't entered into—the agreement that's prescribed under the statute wasn't entered into until after the travel interstate commerce. Well, he was told at some point it's going to take place someplace in Texas. Well, it was— I mean, we've got a lot of moving parts here, but as I understand the record, somebody was told that's involved in this case that the crime is going to take place at some ranch or something in Texas. Well, it was—Agent Leonard claimed that he told Kevin Corley that this would be—the crime would be in Laredo, but there was no evidence that that was conveyed to Walker. Right, but again, we've got a conspiracy to work with. But the object of the conspiracy in my position is it requires a specific intent because of the language of the statute is with intent to commit a murder in violation of U.S. or state law. So my position is it requires specific intent on that element. Of course, Walker didn't testify, did he? He did. He did? He— And was he there where the crime was going to take place? I don't believe he was. He had a defense that was—he denied the factual allegations. All right. Thank you. Thank you, sir. You've reserved three minutes, I think, for rebuttal. Mr. Kretzker. Good morning. May it please the Court. Seth Kretzker for Defendant Epps. For the order of operations for my arguments this morning, Your Honor, I would like to begin by discussing the idiosyncratic sufficiency issue with regard to the cocaine aspect of Count 1. Then I'd like to distinguish the Wallace case, which the government cites in their brief, which issued from this Court last summer, and then finally explain how those two arguments relatedly impinge on our third argument, and that is about the stray comment that the judge made during the jury instructions. That's a powerful purpose for seven minutes, but go for it. Yes, absolutely. Don't talk at the speed of a machine gun. Okay. I will try not to. I'll make the first point very quickly, then. We would ask the Court, when you analyze, write the opinion about our arguments concerning the insufficient evidence with regard to the cocaine-specific portion of Count 1, I would like you to put three pieces of paper from the record in front of you and line them up. During the testimony, the second-day testimony of Mr. Corley around the mid-morning when he began to address the narcotics portion, and the issue of the 5 kilos that was being sent to South Carolina came up, Judge Kazin, to make the point clear, this is during the government's direct examination, page 1401 of the record, Judge Kazin, said this was a special deal with Mikkel, the defendant. Yes, sir, the Court. Okay. And Corley proceeded to explain how the 5-kilogram cocaine transaction was unique to Mr. Mikkel. The government, even in its response to the Rule 29 motion, I'm reading at page 1678 of the record. Again, this is Judge Kazin. Epps was only interested in the marijuana, Mr. Young, the prosecutor. Oh, yes, I think that with regard to that particular load, those 5 kilos were going to Mikkel. That's correct. Were not. Yeah, that. We believe that. I would ask you to look at the testimony of Agent Dussing at page 1604. Direct quote. This is the agent who actually went to South Carolina to do the faux delivery. Mikkel hung up the phone and told me the person wasn't coming, the person being this uncle who had, you know, toyed with him and was going to possibly put up the money to buy. As Judge Barksdale asked Mr. Frizzell, aren't we dealing with a conspiracy here? In his account, as in mine, of course, yes, it's a conspiracy. But conspiracy not to possess with intent is conspiracy to possess with intent to distribute. It is our core argument, Your Honor, that that distinction in Mr. Epps' situation there, too, puts him no different than the classic mere buyer-seller, which is not enough to join that conspiratorial intent to distribute. I would argue, ceding to the second point that I said I wanted to make when I started out, distinguish the Wallace Blocker case that issued this summer. In that case, my client, Mr. Blocker, there were two different loads of drugs. There was a large drug trafficking organization in the Dallas-Fort Worth area. My client, Mr. Blocker, was a very small delivery man in Midland. What the Court hinged on then in an opinion by Judge Stewart was that there was pink meth that they said was common enough to both of these different drug trafficking conspiracies to link them together. That's not what you have here. What you have here, Your Honor, is not a multiple conspiracy variance type argument. What we have here is two different distinct sets of cocaine. You have the imaginary cocaine that they were told, that Corley was told, you could keep a piece of after you assassinate this fellow who had stolen the cocaine down there on this ranch. And there was the talk of the two birds. But even then, if we assumed that's what Epps wanted there, he wanted those two kilos of cocaine, the government charged, of course, the five-kilo quantity. So I don't think the cocaine specific down there at the ranch is going to get them. And as I just said, the – Didn't Corley tell Epps that he'd get 20 kilograms of cocaine in the murder of a hired plumber? Corley told – well, I mean, Judge Graves, let me be very specific as to whether him. The government told Corley that they assumed the 20 kilos were still there when they killed this fellow. Mr. Epps made the comment about the two birds. There was – and this point is also somewhat opaque in the record. Corley never told Epps that at least in part he was going to be paid – No, it's our position that Corley – all Epps said was something about two birds. And, of course, there was this drug jargon, which is its own problematic evidential value. But Epps said something about – It was a recording, correct? I'm sorry. Was this a recording? Yes, it was a recording. And this is where, of course, it turns out – Judge Kazin actually kind of cracked a joke about this in the Rule 29 colloquy. We're looking at page 1682. The transcript of the audio had this listed as inaudible. That's what it says when you look at the transcript. In what? In the transcript, this conversation about the two birds and what was Corley's response, it says inaudible. And when they do the transcript, some – Inaudible. That's what it says on there, yes, inaudible. In other words, when they listened to the transcript, they couldn't make out what was said. And Judge Kazin, although all of a sudden the agent, when they saw this was going to be an issue, said, Well, I actually remember that it was this comment about the two birds. And I'd ask the court to look at page 1682, the court. It's audio? That's a little clever. I mean, it's audio that says we can't understand it, but I'll tell you what it says. So I would ask the court if that's the piece of evidence that the court finds to be sufficient or if the government persuades you that's a piece of evidence which should move you in that direction. I think this should be looked at very carefully, exactly how a transcript which reads inaudible somehow transmogrifies into sufficient evidence that – Did you try this case? I did not, no. Neither Mr. Fussell or I were the trial lawyers. Was the agent cross-examined about how can you say that when the transcript says it's inaudible? I do not believe so. I will check the record when I sit down. I'll have it on my computer and make sure, and I'll bring that up in the rebuttal. The – I see my time is rapidly – I did want to get to the third point that I stated at the outset, and that, of course, is the issue of the comment that Judge Kazin made where he kind of, I said, ad-libbed from the jury instructions. The question here is not, Your Honors. You could ask me, you know, when Judge Kazin said there was, you know, a lot – well, wasn't there a lot of evidence? The publicly reviewed for plain error? Yes. And, Your Honor, let me skip to the end and I'll come back to it on rebuttal. I would argue Judge Kazin – I'm going to argue it's true. Judge Kazin, of course, he dismissed Count 5 for insufficient evidence. When it came to Count 1, he even said it's a close call, it's a direct quote. I would argue, Your Honor, that the fact that even Judge Kazin, regarding the issue of sufficiency with regard to the cocaine in Count 1, as a close call does the heavy lifting that I need to show for plain error on the comment at the jury instructions. That's the harm right there. It wasn't that Judge Kazin simply said there was a lot of evidence at a nine-day trial. Of course, there was a lot of evidence at a nine-day trial.  We're only asking direct examination questions. Let's try to give Mr. Quirt one minute. You've got 60 more seconds to finish that. I'll try to speak a little slower. I do apologize. The government, evidence comes in. There's no doubt. If an objection is not sustained and it's offered by either side, evidence comes in. It's in the record. It's up to the – and, of course, the jury is told do not distinguish – circumstantial and direct evidence has the same evidential value. But those are still credibility determination genres that, of course, the jury is required to make. The government could ask questions, in its case in chief, only direct examinations questions and only adduce evidence of a circumstantial nature. The issue of the two bird, which I'm going to clarify in the record for Judge Barksdale when I come back up for rebuttal, that in and of itself, of course, the agent was not qualified as an expert in drug lingua. He's only supposed to, under the doctrine of this court, such as this court's opinion earlier this year in Aikens, he is only supposed to testify as to drug jargon or lingua. With regard to his specific knowledge of facts in this case from a series of intercepted phone calls, there was nowhere else in any of these transcripts or any of the agent's testimony that he talked about drug lingua or the issue of birds. My point would be this. He made his using that – his explaining what birds meant? No, there was not. I wish there had been, but that's not my argument here, Your Honor. There was not, so I do not have that evidentiary objection to make. The point I would make is that was necessarily circumstantial evidence. It could not have been direct evidence. So at most, that shows Mr. Epps' intent to possess, the intent to distribute, if anything, two kilograms of cocaine, which, of course, is beneath the irreducible threshold of the five kilograms the government chose to charge in count one. All right. As a person who got the most out of his time, you did, Mr. Crutcher. I promised I would. All right. But you got two minutes on rebuttal. All right. Ms. Bowery? Did I say it right? It's Berry. Berry. I'm sorry. That's okay. Everyone does it. May it please the Court, Loretta Berry for the United States. Walker argues for the very first time on appeal that murder for hire under 1958 is not a crime of violence under the definition of 924C. And as Judge Barksdale noted, there's a distinction between, obviously, conspiracy and substantive crimes. This Court laid that out in the en banc opinion of Merrick. Not only is this raised for the first time on appeal, but in Walker's principle and only brief, he cites absolutely no authority for his position. And in contrast, the government has cited plenty of authority. Directly on point is the Luskin case from the Fourth Circuit, noting that the 1958 offense meets the definition of a crime of violence. In addition, the government has also cited other cases in its Rule 28J letter. Interestingly, Walker relied on the Delphic case, but in that case as well, the circuit there affirmed the application of 924C in the context of an underlying murder for hire case. Secondly, Walker also challenges for the very first time on appeal that the evidence is insufficient to establish that he traveled interstate with intent to commit murder. And as this Court has held in McDowell, the defendant must specify at trial the particular basis for acquittal in order to put the district court on notice of the challenged element. Here, Walker was very precise in his Rule 29 motions that he challenged sufficiency on the basis of the absence of an actual victim. In this case, the evidence is overwhelming that Walker agreed to leave Colorado, cross state lines, with the intent to commit murder. It is hardly devoid of guilt or so tenuous as to be shocking under the manifest miscarriage of justice standard. Now, Walker's argued here today that the only evidence of his intent is from Agent Leonard, but this is incorrect. Firstly, there's the testimony from Agents Ryger and Fisher that Walker confessed that he knew the murder would occur on or about March 22nd in Laredo. That's at record pages 1580 and 1581. Now, of course, he does not need to know that the murder occurred in Laredo because the elements of the offense are that he simply crossed state lines with intent to commit murder. But in any event, the record does establish that he confessed he knew it would occur in Laredo. He confirmed his intent to participate during his confession, and he even told the agents, two different agents that testified, that the tactical assignments for the murder were reviewed during the travel down across from Colorado to Texas. The second bit of evidence is Corley's testimony, which supports the two agents' testimony. He stated that Walker agreed as early as January 2012 to participate in the conspiracy, and he traveled across state lines with the kill team. Finally, there's the phone conversation with Agent Corley and Walker on March 19th where Walker and Corley discuss that Walker is going to bring the weapons, the murder weapons, back up to Colorado. As a final point, I would like to note that Walker has not challenged the sufficiency of the evidence to support facilities in interstate commerce, and this court can affirm on that ground alone under Merrick. This court in Merrick held that the offense can be committed in engaging in two different distinct activities, interstate travel or the use of a facility in interstate commerce. Here we have the phones, and we also have the car travel. With respect to Epps, which is really the only preserved issue in this case, Epps seems to focus only on the two birds, two birds, two kilograms at trial. Let me just point out factually, as we've noted in our brief, it was inaudible at trial. The agent said it was inaudible, or I believe that was a quote that was given is that it was inaudible. However, if the court will look at the record transcript, the tape was actually played to the jury, and the exhibit is also admitted at trial, and you can actually hear the word two birds being spoken. But in any event, setting aside the two kilograms, there's overwhelming evidence under Vargas Ocampo, which is the correct standard of review, that Epps is responsible for conspiracy to possess with intent to distribute five kilograms, and the evidence is this. First, there's recorded conversations between Leonard and Walker regarding the finalizing of the cocaine and marijuana delivery to Mikkel and Epps. There's a recorded conversation with Agent Leonard and Mikkel, where Mikkel states that Epps is ready to receive the five kilograms in South Carolina. Second, there's intercepted phone calls, intercepted calls in February, where Epps agrees to give Corley money for weapons and as a good-faith deposit for the South Carolina delivery. In March, there's an intercepted phone conversation between Epps and Mikkel where they actually discuss the five-kilogram shipment of cocaine to South Carolina. And that's the second shipment that we're talking about? That's correct, yes, Your Honor. Third is Agent Duesing's testimony. He testified that Epps arrived on March 27th at the hotel in South Carolina to pick up the cocaine and the marijuana shipment. He testified that Epps and Mikkel stated they did not have the money for the cocaine shipment at that time, but if he would follow them to the country, then he could pick up the money. And finally, Epps actually confessed that he was in South Carolina to pick up a shipment of cocaine and marijuana. So, taxed with all of that evidence, a reasonable juror could find Epps guilty of this offense. For the first time on appeal, Epps also challenges Judge Kazin's comment that there was plenty of direct and circumstantial evidence. It's important to note that if this court looked at the record, page 2175, Judge Kazin was not speaking about either the defense or the prosecution in this case. He never directed the comments to either party. And, in fact, both the prosecution and the defense offered direct and circumstantial evidence. Therefore, it's unclear which party he was even speaking to, and, therefore, the lack of clarity does not amount to plain error. More importantly, though, in Epps' Rule 28J letter and in his brief, he states that Judge Kazin stated, and I quote, there's plenty of direct and circumstantial evidence of the defendant's guilt. And I would point out for the court that Judge Kazin absolutely never said direct and circumstantial evidence of the defendant's guilt. He absolutely never said that. Finally, Epps argues that the evidence was a close call. Again, if the court looks at the records, pages 1677, 1683, 1401, and 1402, Judge Kazin stated that he couldn't recall the exact testimony with respect to the two birds, which I already previously explained. But, in any event, Judge Kazin stated that that was for the jury to decide. And, in fact, that's a correct statement of the law, and the jury did. In any event, Corley testified that with respect to the cocaine shipment, apparently Mikkel's uncle was going to back out of this, of the cocaine, purchasing the cocaine. And Corley told Mikkel that he needed to figure it out, and, in fact, they did work it out, he stated, at pages 1401 and 1402. If the court has no questions, yes, Your Honor. I have a question about your mentioning about Walker, that this crime of violence argument he made today. I was looking through his brief, and I'm not sure it's covered in his brief. You said he raises it for the first time on appeal. Are you saying he's raising it for the first time at oral argument, or simply that he didn't make that point in district court? The point was not made in the district court, Your Honor. Right, but is it even in his brief? No, it is not. This particular one about the offense being complete upon interstate travel, that absolutely was not raised. That was raised in the context of the sufficiency argument. So you're saying he's raising that point for the first time at oral argument? Correct. Not even in his brief? Correct, Your Honor. All right. If the court has no further questions, I respectfully request that the judgments in this case be affirmed. All right. Thank you. Thank you. First, you, Mr. Breazeale. I may have misunderstood the court's question to government counsel. The argument that the offense 1958 is not a crime of violence because the offense is complete upon the use or travel in interstate commerce, that was made in appellant's brief, and I cited in support of that Delpit and Preacher cases. That was made in appellant's brief rather than just for the first time today, if I understood the court's question correctly. And also, Mr. Walker's argument isn't that he was not traveling with an intent that they would commit a crime, the murder. The argument is that the statute requires that the intent be to commit a murder in the United States, and there wasn't clear evidence of that in the trial, that that was the plan until once they got to the warehouse in Laredo, and then that's where the agents told them where this would actually take place, and that's when they were first informed it was in Laredo. And the agent's cover story for this was that this was for El Jefe, who was working out of Mexico, and cocaine was stolen from El Jefe, and that they didn't tell Kevin Corley where this would actually take place because they didn't want these guys to go actually find a ranch that looked kind of like the place they were talking about, so they didn't tell them where it was going to happen. The other issue, going back now to the crime of violence issue, is that the crime of violence as defined under 924C1 does say that the substantial risk has to be during the course of the offense. So if the offense is complete upon use of interstate commerce, if that's the ending point of the offense, then the risk of the violence wouldn't be during the course of the offense of conviction. You know, I don't want to beat this to death because we'll check everything, but I was looking at your statement of the issues. You mentioned crime of violence only in relationship to carrying or possessing a firearm. I don't see any reference to it in your statement of issues about evidence insufficient to prove he traveled in interstate commerce while intending that a murder would be committed for hire. But we'll check. Oh, there were separate issues. I may have misunderstood. Issue number one was the sufficiency of the evidence for the murder for hire. Yes, sir. And issue number three was the carrying a firearm in relation to or in furtherance of a crime of violence. And I just didn't recall your working crime of violence into the murder for hire scheme, but we'll check all that in brief. All right. Thank you, Mr. Frizzell. Mr. Frizzell, you and Mr. Kretz are a court appointed, and of course— Oh, sorry. He's got to give us two minutes. Oh, I'm sorry. I didn't mean to cut you off, Mr. Frizzell. I'm just—actually, more overall, that I don't fail to thank both of you for your service, but I won't forget to do it. But I apologize to you. Absolutely. I'd like to agree with the prosecutor that there's no doubt— What about addressing the point you told me you were going to address when you started your rebuttal that I asked you the question about? Yes, Your Honor, I don't see that they cross-examined, as I would have, about the fact— Good Lord. I'm sorry. I don't—no. You know, that's—go ahead. Judge, my point would just be, no, I do not see that they cross-examined him on the difference between the inaudible that was written on the transcript of the wire and what he then later said the wire to be. I would point out, though— No, I just find it strange you say he didn't cross-examine him, as I would have. Of course, you are raising ineffective assistance to counsel. Yes. But a little bit of patting yourself on the back there, counsel. That's not what I meant at all, Judge. I meant that I, of course, believe in zealous cross-examination. I'm sure you do. Yes. In the cross-examination on page 1022 of the record, it's a direct quote. This is the agent. Calvin Epps is trying to get out of the 20 kilograms of cocaine, he's trying to get 2 kilograms out of that cocaine, leaving Kevin with 18. The problem, even putting aside the fact that obviously 2 is less than 5, is the same problem, Judge, that you— Not all the evidence. The government attorney was talking about the phone calls, etc., where the discussion was made of 5 kilos of cocaine. Yes. There's no doubt that Mr. Epps knew that in the load of marijuana that was coming, there was also the 5 kilos of cocaine were going to come. It's our argument, Judge, that it doesn't go the next step. Where is there any evidence that Mr. Epps joined a conspiracy to distribute that cocaine? Certainly not with regard to the simple 2. All he said was he wanted 2 kilograms. That could have just as easily been for personal use. Same with the 5. It was Mr. Mikkel who we all know had— Personal use of 5 kilograms of cocaine. Judge, even in the viewed in light most favorable to the government's theory of the case, the government still bears the burden to adduce sufficient evidence as to every element, and there was simply no evidence that Epps had any intent directly or conspiratorial intent to distribute any cocaine. He was nothing more—situated no differently than the mere buyer-seller situation, which, of course, under this circuit's authority, is insufficient for conspiratorial intent to distribute. All right. Thank you. Now, Mr. Fussell, Mr. Spencer, I just didn't want to fail to— Thank you for your court-appointed status, and thank you on behalf of not only our panel but our entire court for the work you do in these court-appointed cases. So we appreciate your briefing and your oral argument. Thank you to the government for the briefing in this case. This completes the oral argument work for this panel for this hearing.